May it please the court, my name is James Jardine, I'm the attorney for the appellants today, deputies Edgerton, Medeiros, and Coker. Your honors, I've had an opportunity to respond to the case law, etc., that was cited in the appellee's brief, so I won't attempt to go back through that. I do have some things I would like to address, but I would first inquire if the panel has any particular issues they would prefer that I address first, or any particular facts in the record that I address before I do that. Your honors, I think, you know, what this case is really about is, in a prison setting, when we're talking about what appears to be a disagreement between an inmate and a correctional officer, which of those parties is entitled to make a judgment about the disagreement? And I think the case law is pretty clear that we have to give discretion and that authority to the correctional officer in the first instance, and that's what happened here. We have a pretty typical situation, we have an inmate, Mr. Beavers, who in the first instance with respect to the Medeiros incident, he's got a pair of canvas shoes, he's got, he believes he has an order that entitles him to wear them. He's unable to produce that order and he's directed by a property technician that he needs to turn them over, and he won't do that. So the property technician summons a higher level of authority, summons Deputy Medeiros, and there's a brief exchange between the two. You need to take off your shoes. Mr. Beavers doesn't want to do that. He's asked to first, then he's told to, and his response to that is that he wants to elevate this discussion further on the spot. He wants a sergeant to be brought in to resolve the dispute, and at that point Deputy Medeiros makes a decision. He decides that he's going to forcibly restrain Mr. Beavers and that this issue, whether or not those shoes need to be returned to Mr. Beavers, will be resolved in the future rather than in the moment, and in fact that is what happened. Those shoes were returned to Mr. Beavers the next day, and I think the facts of the case confirm that that's how it should happen. Correctional officers need to be given discretion and flexibility in order to resolve these disputes right then, simply, and quickly with a minimum of fuss, and there's nothing in the record to explain to us how the order that was being given to Mr. Beavers was so, was a foul in any respect of constitutional standards that would justify his refusal to comply with it in the first instance. All the district court decided here was that there were genuine issues and material facts such that your clients weren't entitled to summary judgment, that it needed to go to trial. Understood, Your Honor, and our position is that when we're talking about a, this is not a use of force, there were no baton strikes, there were no blows. Well, it was chicken winged. It was a control, a pain compliance technique was used to handcuff him, that is correct. All right, and the question, the question is, did they go beyond what they're supposed to do? Did they, did they use more force than necessary and hurt him in the process? And my position on that, Your Honor, would be that if a pain compliance technique is authorized, if that's not, if that's not impermissible, then for purposes of qualified immunity, I don't see how pain compliance techniques could ever be used. You could be, you could be, you could be chicken winged and dislocate somebody's shoulder if you pushed it too hard. You can break, you can break an arm, and it's very difficult to say that just because you're authorized to use a plain, a pain compliance technique and that chicken winging is one way to, to do that, to pull somebody's, pull somebody's arm up behind him, but if you push it hard and the guy screams and you keep doing it, I mean, these are, these are, these are issues and there are degrees of, there are degrees of truth here that, that are difficult for us to resolve on this record. I understand, Your Honor, but, but the facts of this, this case, there was no dislocation, there was no broken bone. What we have are soft tissue injuries, so if we're going to begin parsing levels of force within soft tissue injuries, how will qualified immunity ever apply to the use of a pain compliance technique at the summary judgment stage? It would be impossible. All that the plaintiff has to do is say it hurt too much and, and we're done, and it is literally the least invasive technique that the deputies can use to gain compliance from someone who won't comply, right? This wasn't a taser. I mean, we have examples where you can use a taser on someone during a traffic stop and that's okay, which I think at first blush sounds a little bit shocking. Well, it's pretty factual dependent and that's the whole point. It is, Your Honor, and we're not disputing any of the facts. What we're saying is that this case is important because correctional officers need to have this level of discretion. They need to be able to make this decision because let's think if the opposite thing had happened here, if Mr. Beavers had simply complied with the direction and it turned over his shoes. And let's say that, that something untoward happened after that, that the shoes weren't returned. There are, there are procedures for Mr. Beavers to address that constitutional deprivation. None of them involve resisting. What his concern was, the shoes wouldn't be given back to him for 30 days. That was his concern that, I mean, and I, I, that's beyond dispute that it was his concern, there's no evidence in the record to suggest that that was a concern that was based in a particular fact as applied to this situation. What about the claim of deliberate indifference to medical needs against Koester where the, where, and this is a pretrial detainee too. So, I mean, you know, there's a distinction between correctional officers in a prison and pretrial detainees. He was left chained to a bench for over 12 hours and received no medical treatment at all for three weeks. How could that not give rise at least to a material disputed fact as to whether that was deliberate indifference? I mean, in my mind, if that's, if you're not disputing that fact, I would maybe grant summary judgment to the plaintiff. Your Honor, so there were two components of, of his claims with respect to that. One was as to Monell, which would indicate that. Oh, you went on Monell. We did. What I was going to say is that the, the missing link here is being able to link that deliberate indifference to Deputy Koester because what we can't establish is that Deputy Koester ever had any knowledge that Mr. Beavers was scheduled for a medical appointment that morning at 8 AM, which he had missed. He was, I'm sorry, go ahead. Do you, do you acknowledge though, the legal premise that, you know, if he did have, if it were established that he did have knowledge, you know, would you lose? Well, there would have to be deliberate indifference with respect to, to not, to, to, to preventing Mr. Beavers from, from attending that appointment. So it's, it's, knowledge itself is not enough. There's got to be deliberate indifference to the right. And again, we don't have anything in the record. Mr. Beavers doesn't ever tell us that in fact, he had a medical appointment. What he tells us is that a nurse told him that she would have a doctor see him. Let us cite the medical appointment. His, he was left chained to the bench with his face black, blue, and swollen for over 12 hours and received no medical treatment for three weeks. Forget whether he had an appointment or didn't have an appointment. Again, Your Honor, we would have to link the failure for him to receive medical treatment for three weeks to Deputy Coker. We do know that Mr. Beavers was seen. And you don't dispute that fact that he was left chained to the bench for 12 hours with his face all swollen and bleeding? I mean, Your Honor, if I dispute it, I'm lost. The record is what the record is. I'm, I'm, I'm not disputing what Mr. Beavers is saying. What I'm saying is that there is no evidence which links Deputy Coker to causing him to miss his medical appointment. None whatsoever. But I guess, counsel, the concern that that raises, you know, for me at least, and I think it's most apparent on this claim, but to some extent applies to the others, is, you know, it seems like what your argument is, is not, you know, these facts do not establish a violation of a clearly established constitutional right, which we could review, but rather, you know, the plaintiff hasn't adequately established the facts, which we don't get to review, right? The Supreme Court has said that, you know, we, you, you can't take an interlocutory appeal on the question of the sufficiency of the evidence to survive summary judgment, and, and it seems like what your argument is, is, you know, there's not enough evidence here. Your, Your Honor, my argument is that the evidence that he's presented doesn't establish a constitutional violation as to Deputy Coker. He can't show that Deputy Coker was deliberately indifferent to the fact that he had a medical appointment that morning. He can't even show that he had a medical appointment that morning. What we do know is that his initial complaint, he was taken to a nurse by Deputy Espinosa. He was evaluated and the nurse told him that she would have a doctor see him. What we can't do is we can't link that knowledge to Deputy Coker. I'm not saying that Mr. Beavers wouldn't be able to mount a claim with respect to that fact pattern as to somebody else, but with respect to Deputy Coker, there's no evidence that ties Deputy Coker to Mr. Beavers missing his medical appointment or to not being seen for three weeks. Is Coker the one who, who originally chained him? No, no, he is not. That was, I believe, Deputy Espinosa escorted him to the bench and chained him there. It was not, it was not Deputy Coker. Actually, no, I'm sorry. I'm misspeaking. We don't know who, who chained him to the bench. But, but Coker sees him on the, on, at the end of his shift, somehow then he gets, he gets chained and Coker then sees him on the, on the next shift when, when Coker comes back in. So Coker sees him something like 12 or 24 hours apart. No, no. Your Honor, the timeline is more compressed than that. It is all within the same day. It's within the same day. Deputy Coker comes and visits him where he is chained to the bench. I believe it's at 2 PM in the afternoon. And I think he then returns to see Mr. Beavers to arrange for him to be escorted to classification because Mr. Beavers had expressed concern that he could not be housed in the BMOD any longer. And I think what's very notable about Mr. Beavers' declaration in terms of his description of his interactions with Deputy Coker, Mr. Beavers never says that he told Deputy Coker, I missed my medical appointment. He never, he never says that he told Deputy Coker, no one's been to see me. I've not had any food. I've not been allowed to use the bathroom. I urinated myself. He never says anything like that. He doesn't give anything to connect his claims of deliberate indifference to Deputy Coker. There's just nothing in the record which suggests that. Why don't you reserve your three minutes, three and a half minutes, and let's hear from the other side. Thank you, Your Honor. Thank you. Good morning, Your Honor. Robert Brown on behalf of Plaintiff Gary Beaver, Gary Beavers. Well, I'll pick up where Mr. Jardine left off with respect to the Coker case. And I think that under the circumstances, the medical appointment, as Your Honors have picked up on, doesn't really make much of a difference. The record is, is that Deputy Espinosa handcuffed Mr. Beavers to the bench in front of Mod A at 6 a.m. At 7 o'clock a.m., Mr. Coker directed a remark to Mr. Beavers. Now, if you recall from the record, Deputy Coker was the B-Mod deputy, which is to say that he was in charge of the inmate count and also the medical visit. So it was his job to know exactly where each inmate was at any given period of time. So during this, after about two hours of being chained to the bench, Mr. Coker, Mr. Beavers urinates on himself. Previously, the day before that, Mr. Beavers had approached a Deputy Coker with his face swollen, his eye blood red to request a medical appointment. He did not receive one until the next morning when he had talked to Judge Espinosa, I'm sorry, to Deputy Espinosa. Deputy Espinosa at that time made sure that he got to the nurse who mentioned the medical appointment. At about 6 a.m., he asked Mr. Beavers if he felt safe going back to Mod B. He mentioned that he did not, in light of the fact that he had been attacked by an inmate. What was going on here? Was your client, did he himself use any force toward a fellow inmate or the officers? He did not. He was attacked by an inmate in the day room. Now, was there something about your client that made him particularly vulnerable to attack or abuse or something? Yes. The fact of the matter is he was about 64 years old at the time. He is, I don't know if you had a chance to see the videotape, he is a very slight build, about 5'9", maybe about 5'10", maybe about 170 pounds. And he was- Received his old and weak. Exactly. So, at the point in which he's handcuffed at about 2 p.m., and this was not responded to in the appellate's brief, or not mentioned in the appellate's brief, you have Deputy Coker, who goes to see Mr. Beavers, who's chained to the bench. So what would he see? He would see a man who's chained to a bench with the left side of his face bruised and swollen. He's just, he's urinated on himself. And Deputy Coker, at that point, I believe shows a deliberate indifference by not trying to seek to get him any medical aid. And if we talk about what was not said, Deputy Coker does not ask him if he was all right. Deputy Coker doesn't ask him if he is in any discomfort. Deputy Coker takes no action to see whether or not he needs any type of medical attention, given his visible injuries. Instead, what Deputy Coker does is he taunts him and makes some reference to some type of homosexual activity between other inmates. And then also asking Mr. Beavers why he didn't take care of it himself, the situation with the inmate who attacked him. He then comes back at 6 PM after Mr. Beavers has been chained to the bench for about 12 hours. And then he says to him, well, do you want to go back to your cell or do you want to go to the classification section? When Mr. Beavers mentions at that point he wants to go back to his cell, he says, okay then, classification it is, where he is held for more hours. And so, as a result of the fact that the deputy who is in charge of having some knowledge of where each inmate is and whether or not there are any medical visits, that deputy does not take any effort to get him any type of medical aid. He's not able to receive medical attention until about three weeks later. Regarding the Madero situation, what I would say about that is context is everything. First, Mr. Beavers was asked whether or not he had any medical documentation with respect to the shoes. He did, in fact, have that documentation. It was not on his person because the facility he had just left had told him he couldn't have it on his person. He had it in his bag containing his possessions. So, you have a situation where Deputy Madero's claims to want this information with respect to whether or not he's entitled to his shoes. But yet, he does not allow him to walk the three or four or five feet in order to produce that information for him. Because Mr. Beavers lets him know that I do have the information. And when Deputy Madero takes what I would say the unreasonable position that if you don't have it on your person, you don't have it. At that point, and this is why I say context is everything, he makes a very reasonable request. Look, can we get a supervisor here? And in fact, Deputy Madero, if you look in the record, admits that that is a reasonable request. And Deputy Madero admits that he could have contacted the medical intake in order to get this information that he claims that he wanted. Deputy Madero refuses. He refuses to allow Mr. Beavers to comply with his initial request to get the document out of the bag. Once again, context is everything. You have Mr. Beavers, who is 64, 65 years of age. He's talking to a deputy who is, at that time, I think he was 29 years old, 6'2", 205 pounds, flanked by two other deputies. Deputy Madero's claims that Mr. Beavers is acting very aggressively in terms of his hand gestures, and he's being very aggressive and non-compliant. However, as Judge Guilford pointed out upon reviewing the videotape of the video recording, that does not appear to be the case. And in fact, you don't see anything on that video recording of Mr. Beavers being physically demonstrative at all. Deputy Madero admits that Mr. Beavers never made any type of physical movement which would indicate that he would be a threat. And if you look at the videotape, it appears that he is starting to turn around. You can't hear what's being said, but he's starting to turn toward the wall when all of a sudden, Deputy Madero sets upon him and chicken wings him with the assistance of the three deputies. And at no time do you see Mr. Beavers trying to resist or use any force whatsoever. And so, understanding that when you're dealing with law enforcement situations that they're very fluid, understanding that an officer has the right to take into account whether or not he's safe in dealing with someone. Based on these facts, he clearly was. You had an inmate who clearly was not a threat, who made a very reasonable request in order to avoid having to lose his canvas shoes for 30 to 60 days. And as a matter of fact, he did get the shoes back the next day. That's because he had the order, but he was not allowed to get it. With respect to the very last situation, that being Deputy Edgerton, that is a situation in which there was no, well, there was an instruction. Deputy Edgerton instructed Mr. Beavers to produce the document or the order which allowed him to bring his folio to his medical appointment. Prior to that, Mr. Beavers had been in a cell, or in the holding cell with Deputy Song. He had requested for a cup in order to be able to take a pill because the water fountain there wasn't sufficient pressure. At that point, when he asked Deputy Song, who consents, Deputy Edgerton hears this, comes down the hall and tells him very emphatically that he would not allow him to do that. He asks for, he uses language that I won't repeat, but it is in the record, to produce the order for the folio, and as Mr. Beavers, who's now at this time very anxious, he can't put his hands on it right away, he asks again if he could have a cup to take some water for a pill. At that point, Deputy Edgerton becomes very verbally abusive, and once again he tells him no. Mr. Beavers makes a statement, well, what kind of man doesn't allow someone to take a pill? He's not refused to do anything. There is no instruction that Deputy Edgerton gave him that he refused. At that point, Deputy Edgerton sets upon him, grabs him by the arm, and he chicken wings him. And it is clear in the record that Deputy Edgerton admitted the reason why he did it was essentially because I didn't know what he was going to do. That is constitutionally insufficient. You don't, as it's set forth into the D'Orly case, is that it is not enough for an officer to say that they have a fear for safety. There has to be some objective reason. Once again, Deputy Edgerton, his basis for him taking the action was that Mr. Beavers was loud, his face was red, and he seemed visibly upset. What is missing is the fact that he did not have anything in his hand that could be used as a weapon. He did not take any type of physical action which would indicate that he was going to do anything to hurt Deputy Edgerton or any of the deputies, nor did he make any type of physical threat. And when asked, well, if you felt threatened, why didn't you tell him to sit down? I just didn't. Why didn't you tell him to face the wall? I just didn't. So with respect to these situations, you have a deputy who is older and weaker. And once again, in this situation, we have Deputy Edgerton, who at the time was 6'2", 250 pounds, 39 years of age. He had another deputy, Deputy Song, who was also present in the holding area. Clearly, Mr. Beavers presented absolutely no threat to either deputy, and that is undisputed. So with respect to Deputy Medeiros and Deputy Edgerton, it appears to be undisputed that neither of these deputies felt that Mr. Beavers presented any type of risk of harm. And yet, they still opted to use force. And in assessing whether or not the force was reasonable, you have to ask whether or not force was necessary under these circumstances. Counsel, can I ask you, do you think we have jurisdiction over this appeal? Because of course, we don't have jurisdiction to review if the challenge is to an order determining that there is a genuine issue for trial. I'm just wondering how you see the issue that's been presented to us. Well, I'll say I was surprised. I think that the court was, I mean, there is certainly precedent to say that to the extent that there are disputed issues of fact, that those would need to be resolved before the court could then make a determination as to whether or not that there was qualified immunity. I acknowledge that the court has certainly the jurisdiction to assess qualified immunity issues. But certainly, in light of this case and what I just heard from counsel, if they're acknowledging that there were disputed issues of fact with respect to each of these cases. And when I say each of these cases, I mean with respect to Deputy Coker, Medeiros, and Edgerton. Then I'm a little bit puzzled as to why we're here under those circumstances. And if there are no other questions, then I would submit. Thank you, counsel. Thank you. Very briefly, your honors. We're not alleging that there's a dispute here. The district court refused to reach qualified immunity finding that there was a dispute of facts. And it based that characterization on, as Justice Bybee, you were saying, whether or not the level of pain compliance technique that was used here. Whether it's excessive, which would involve an evaluation of reasonableness. Our position is that when a correctional officer is faced with repeated non-compliance, that a pain compliance technique is constitutionally permissible. What about our case law that says when there's no need for force, any force is unconstitutional? I think that's the Dorley case, or maybe it's the Headwaters case. That's the general statement of it. But we're not talking about baton strikes. We're not talking about anything of that nature. What we're talking about is literally the least invasive application of force to compel compliance. There's no need for force. Why is any force justified? Your honor, let's just think about the situation with respect to Deputy Edgerton. Mr. Beavers, the characterization I would give to Mr. Beavers' conduct in that encounter is that it appears that he's stalling. He continues looking for this order. He's not complying. He's not handing over his bag. It just started. I've probably got a minute left less than what's showing on here. It's showing me 315. It did just start. It wasn't going before. Okay. I'll cut off at one minute left. I think I've been going. I'm sorry, your honor. It is your sentence. I was just wondering what was going on. The question I would have, if a correctional officer is faced with a situation where objectively he could conclude that the inmate is simply stalling, right, just keeps looking for the order. Now we're asking for a cup of water. We're changing the subject. How long does the correctional officer have to wait before he can say enough is enough. I'm going to neutralize you in a safe fashion where you can't move around this cell in this hospital outside of the jail where it's me and one other deputy and one other inmate and the medical staff. I'm going to neutralize you so I don't have to worry about you. And I'm going to figure this out myself. How long does he have to wait? And I don't think that that is a question that the courts should begin to enter into. Because again, this case would be radically different, of course, if Deputy Edgerton had begun striking Mr. Beavers. If we had had some display of force that is just unquestionably beyond the pale. But that's not what happened. He confined him. He went and looked through the bag himself. When he determined that Mr. Beavers was a proper inmate, he returned it to him. He undid his handcuffs and that was it. That's it. And again, it's a very different question. If Mr. Beavers simply complies at the beginning and says, I can't find it, and Deputy Edgerton picks it up and locates it and returns to him, then we have no issue at all. The problem is when we take away the discretion of the correctional officer to make the decision in the first instance and to proceed in a reasonable fashion, and I have gone beyond what my time is. Thank you very much, Your Honor. Yes, thank you very much. Beavers versus Edgerton will be submitted.
judges: Wardlaw, Bybee, Miller